This is 4090917, the Champaign SW Mass Transit District v. Champaign-Urbana Mass Transit District. We have for the appellant, Mark Ansell, and for the appellee, Brett Kepley. Mr. Ansell? Good afternoon. I am Mark Ansell, and I am the attorney for the Champaign-Urbana Mass Transit District in this appeal. Today I am also authorized and will be speaking on behalf of our defendant, the City of Champaign. Our positions are virtually identical on all issues. Have you entered your appearance on their behalf? Yes, we filed a joint brief. On August 31, 2005, the Champaign-Urbana Mass Transit District, sometimes referred to as the CUMTD, annexed a tract of urbanized land that had just recently been annexed by the City of Champaign itself. This annexation was done pursuant to Section 8.5 of the Local Mass Transit Act. It was also done pursuant to an intergovernmental agreement between the City of Champaign and the CUMTD, whereby the MTD promised to extend their services and annex territory that was and had been annexed by the City. As the City would grow, they got a commitment from a contract that the City would follow suit. It was also done pursuant to a long-range transportation plan that had been developed and in place for many years, developed by several state, regional, and local governments, including the City of Champaign, the City of Urbana, and of course the Champaign-Urbana Mass Transit District. Now the focus of this case and this appeal is on Section 8.5. That is the mass transit districts to annex contiguous territory, but only if that territory is within a municipality, is not farmland, and is not a part of another mass transit district. Now the Local Mass Transit Act, of course, is a comprehensive and detailed statutory scheme that addresses by the legislature how to create, expand, annex, and administer local mass transit systems. It includes provisions for how to create your own, how to annex voluntarily, how to be annexed by an existing district, and in each situation, the legislature declared this would be done by ordinance, this would be done by referendum, this is the procedure for this and that. But the legislative intent behind Section 8.5, which is one of those, is obvious and apparent from its terms. This section empowers existing mass transit systems to extend their services into newly urbanized areas on the edge of town. It enables mass transit to keep up with urban growth and expansion, and it supports the goal of maintaining a single unified mass transit system to serve a single metropolitan area. This goal is a goal that is shared by the federal government, the state government, the regional transportation planning, and all local governments. The object and the logic of a single unified mass transit system we believe to be self-evident. Now the legislature's grant of this authority to an existing mass transit district under 8.5 obviously addresses a very significant policy question, and I might say that question is here in this case now in this courtroom. That question is, who decides whether an existing mass transit system should be extended to a newly developed area on the edge of a city? Should it be decided by the residents of the subdivision or neighborhood, or should it be decided by the larger community of which they are a part? Obviously the interests of the majority of residents in a neighborhood might not always be the same as the interests of the community as a whole. Weighing the interests of these two groups is the responsibility and the prerogative of the legislature. Section 8.5 answers the question. They answer it in favor of the interests of the greater community. That much is clear from section 8.5 if the very specific and limited my opponent's arguments. Some would say this is a compelling policy choice the legislature made, and it is so for the following reasons. Those residents on the edge of the city take advantage of the benefits of the city of which they are a part. They go downtown. They use the streets. They take up parking spaces. They add to the air pollution. Under these circumstances, as one community, it is only fair that they share in the cost of managing or maybe even solving these urban problems. And they should not be allowed to cherry pick which local government services they are using. Maybe they are willing to pay for park district, but they don't want to pay for mass transit. Maybe they are willing to pay for forest preserve, but they don't want to pay for library. This is wrong. It's unnecessary. And in the case of mass transit, the legislature has made that decision. Well, there are cases cited that have sharing of utilities and other such services between municipalities. Why shouldn't those be extended to mass transit? I'm not sure if I follow the question, but I know that there are some cases on a sharing issue that I will address where the courts have recognized two different government entities, two entities of different character with some overlapping powers that are found to be compatible by the courts. But of course, in this case, if the question of sharing is involved, we are dealing with two identical local government entities. They are both mass transit districts. And the cases involving identical local government entities are clear and uniform that they cannot share or tax the same territory. I'll address this in greater detail in a moment. But for the moment, I would like to show the court with consent of counsel a blow-up of some of the maps that are already in this record, just so that you can see for a moment the geography of what we're talking about. The copies are hard to read. Thank you. Yeah. This is the city of Champaign-Urbana in the large red surrounding area. Here to the southwest is the disputed area. The red outline is the part of the mass transit district that was annexed by CUMTB. The yellow is the area that was designated for the new competing southwest district. So Urbana, Champaign, southwest area. We can assist you by showing you on this blow-up of the disputed area that the city, I'm sorry, that the CUMTB did what the statute said. They annexed areas that were not farmland, that were developed, that were an extension of the growth of the city. The southwest district, on the other hand, chose to designate themselves an area that included not only this, but a very large swath of farmland, agricultural land that is not developed at all. And for the purposes of this, I will make only two points and then continue with my argument. Number one, if this area annexed by the CUMTB is eliminated and disqualified from being in the next new district, which I think it is, what is left? Who is left to vote? 99% of the voters would be gone. The referendum would then be asked of maybe a couple dozen farmers if they would like to have themselves a mass transit district out here. What would the results of that referendum be? We don't know, but it would be very different. And that's what should have happened if they really wanted mass transit after this area became a part of the CUMTB. Does the red area that's within the yellow area, does that also track the annexation by the city? The city's annexation includes substantially all but not all of this. There are a few areas such as Lincoln Shire Fields that are too big, 60 acres or more, that were not annexed by the city, but they are part of Champaign Township. And under the 8.5, it says that this all has to be part of a municipality to be annexed, but the definition of municipality in the Local Mass Transit Act is also very specific and it includes townships. So not all of this is part of the city because a part of it is a rather large subdivision and golf course, but it is all part of a municipality of one kind or another, either the city or township. Substantially all of this is in the city. There's another very important point to make here before I move on. If the area annexed by CUMTB were carved out for some reason, but the rest of the district were allowed to stand, if this is valid mass transit, as the city grows in this direction, the CUMTB will never be able to annex it. Because that's one of the disqualifying factors of extending your system. You cannot extend your system by annexation, by ordinance, into another mass transit district because you cannot have two mass transit districts in the same area. Are you contesting the formation? Yes ma'am. The complete formation. So in other words, all of that. At this stage you cannot carve out this area because the results of the referendum are unknown, but to us rather obvious. So you have to disqualify the entire district. And we're contesting it not only on the grounds that some of this area was disqualified, but I will in a moment talk about other procedural defects in their formation under section 3.1. Yes? Before I go on to another substantive issue, please take note of the alignment of the parties in this case and the way it evolved. This litigation was initiated against my client, the CUMTB, by an individual named Scott Tapley, at the time a county board member who resided in the disputed area. Southwest District wasn't in 2005. Mr. Tapley initiated this litigation. The Southwest District came into existence a year after this annexation in 2006 after a referendum. The Southwest District didn't enter this lawsuit until October 2007, and they were aligned as a party plaintiff with Mr. Tapley. At the same time in October 2007, the city of Champaign and the city of Urbana asked to join this suit on behalf of the defendants. And the trial court allowed the city of Champaign in the fall of 2007, but they found that the city of Urbana didn't have a sufficient interest and didn't allow the city of Urbana, even though the city argued and asserted the same interest that they would like to have their people be able to take the mass transit all the way across town and visit friends here. And they would like to have their people be able to get their friends who live here take mass transit all the way across town into Urbana. They would like a single comprehensive unified mass transit system. The court said that the city of Urbana didn't have a sufficient interest there and didn't allow them to join this lawsuit. The court allowed the city of Champaign because they shared a common boundary in the disputed area. It was in December of 2007 after this lawsuit was more than two years old that Mr. Tapley withdrew from the lawsuit. His allegations, his theories disappeared. He took a voluntary non-suit. He left the area. That might be significant in some of the issues here. Now let me get to the sharing issue. I think the most fundamental error that the trial court made in this case is to hold that not only are both mass transit districts validly asserting jurisdiction, validly created, validly annexed, but they can't share this disputed territory. They can tax it, both of them. Before I discuss why that is wrong, we should note that the CUMTD's annexation, which occurred in 2005 before the Southwest District existed, it is undisputed that CUMTD followed every requirement of that annexation statute when they passed that ordinance. Their annexation was good, valid, and nobody's challenged that they didn't follow the process. My opponent makes the argument that in 2006, when the Southwest District came into being, it nullified the annexation. He makes the argument based on a principle that he calls the fundamental right to vote, which should nullify a valid governmental action. I'll address that in a moment. But it's important here to note that the Southwest District has never argued that the 2005 annexation was void ab initio at the time, except that he challenges the constitutionality of the statute. So the process was followed by CUMTD, and we submit the annexation occurred pursuant to the terms of 8.5. Now back to the sharing issue and why the trial court was wrong in allowing two mass transit districts to tax and share. Illinois law is quite clear. The two local governments of the same kind and character, created under the same statutory scheme with the same identical purposes and powers, cannot tax and share the same territory. This principle is widely recognized across the country, and it was adopted in Illinois in the 1800s. It has been consistently repeated in the cases of the past. The cases right on point by the Illinois Supreme Court are 100 years old. They would include, for example, Bancroft versus Lease, where two sanitary districts were fighting for the same territory. Or Ziegler versus Douglas, where two high school districts were fighting. My opponent and the trial court disagree with this premise, but they rely on They did not share the identical powers. They were not created under the same enabling statute. For example, cases such as West Chicago Park District, where there was a dispute over who should have police powers. The park district's police powers under their statute, or the city of Chicago's police powers. Could they get along? Could they cooperate? The court was faced with this issue, but they were not identical government entities. The other example relied on erroneously by our trial court is the Woodward case, where there was a dispute between a common school district under the school district act, and a high school district of some of the same territory under the high school district act. In that case, the court said they can get along. The high school could be put over here and not necessarily conflict with this high school on this side by the other district. But I submit to you, when you're talking about mass transit, you're talking about the work and be efficient. You can't say they can decide not to take their buses there. They can decide not to put their buses there, because that's not what mass transit is. Mass transit is everywhere. But this map you just showed me, these are not identical groups. It's not an identical territory. The territory is not identical, and nor is it in any of these cases. It always involves some overlap. For example, the park district and the city of Illinois were overlapping territory, and they were both allowed to police it. But they weren't both the same kind of character. What we're talking about here is two districts that are created under the local mass transit district act, not allowed to tax or serve. That's what Bancroft and Ziegler stand for. There's never been a case in Illinois where the identical type of government entity has been allowed to share. I should say two of the identical type of government entities. So as it stands now, the people who live in that section where both operate or could operate would be taxed twice. They are being taxed twice as we speak. Now the fact and the record will show that the tax rate of the southwest district is rather low. They don't provide service. They have no plans to provide service. They've even announced that if we prevail in this case, they'll disband. The reason is because, of course, they organized really hoping to keep us out. That's why they did it. Because they think you do a bad job? Well, the reasons are many. First of all, they're taxed if they come in. Second of all, they see our buses are empty often when they come out to the edge of the city, and they think that they're empty everywhere in the city. Yes, some of them, the majority of those who voted, which is not close to a majority of the residents of the area, would rather not pay taxes because they don't need the bus. They have a car in their garage, and they don't think we do a good job or spend our money wisely. Of course, when we had our public hearings, we also had people come up who wanted mass transit, people in wheelchairs who needed mass transit, people who didn't own cars. Yes, some of them don't want to pay the tax because they don't need our buses. And the fact that there may be people who want to come visit them, they would rather make their own decisions as a neighborhood than let the community as a whole decide what's best for the community as a whole. But the legislature has made that decision, and that is our argument to you. The legislature has said that if and when you're on the edge, you've been newly developed, you're not farmland, you can be a next, so that a single mass transit system can serve. Councilman, before we run out of time, how about the argument that the vote of the public trumps the action of the municipality? Very important question, very good question, very simple answer. The Illinois Supreme Court's Spaulding case. This principle of the vote doesn't involve a fundamental right to vote. You're not voting for a candidate for public office in this situation. You're not voting for a representative in your government. The legislature decided to extend the right to referendum in certain circumstances and to not extend it in others. Spaulding was the very same thing under the school code, and the Supreme Court said that when the state sets up a scheme that grants a right of referendum in some cases and not others, it is not giving a fundamental right to vote, and that isn't a fundamental right to vote. It's a permissive right that the legislature can take away anytime they want. So the Spaulding case would answer that question. There is no fundamental right to vote here, and the legislature made a different choice under this very narrow circumstance. Thank you. Thank you, counsel. Mr. Kepley. Good afternoon, your honors. May it please the court and counsel, my name is Brett Kepley. I'm with the Southwest Mass Transit District. The discussion here has been on the overlapping of two governmental entities. Is it permissible? Is it permissible under Illinois law? Is it permissible under the local Mass Transit District Act? The answer is clear, I think, on two points. Counsel has argued that it has been established Illinois law, you cannot have two governmental entities that overlap territory at the same time, same place, that provide the same services. That that is an absolute bar. That is not the suggestion that has been made by the Illinois Supreme Court in the cases we've cited in our brief, particularly the Greening versus Bartloff citing the Darrell versus Woodward. These are 1940 and previous cases where you had overlapping local governmental entities dealing with packing plants, licensing for packing houses and so forth. And those cases, particularly Bartloff, went through this discussion and said that the rule of two municipal corporations not exercising their powers within the same territory at the same time should be practically and reasonably enforced so as to not overburden the citizens with taxes and yet be allowed to do so in such a way as to allow the furnishing of needful facilities. So it's not an absolute bar. And particularly, particularly in this case, most of the cases cited by CUMTD have to deal with drainage districts overlapping or sanitary districts. So the question is, do you want to pay two taxes for the same ditch? Want to pay double taxes for the same sanitary plant? We don't have that here. Transportation is a very different thing. You have a marketplace, different routes, different times, different fees. And it would not be necessarily an overburden for these two governmental entities to overlap and both tax their citizens because you're going to provide them with, quite frankly, maybe twice as much service. Are you suggesting that you are a marketplace? You have a constituency that wants mass transit and that you are going to use the tax dollars that are collected to provide mass transit to this area? The suggestion is, can you? I'm asking, are you? Well, that question we don't know yet. In other words, is the Board of Trustees of the Champaign Southwest MTD going to do that? No, they've deferred planning because they're waiting to see what the results of this litigation are. Because obviously, it will impact greatly their planning, depending upon whether there's going to be other bus routes and schedules as well. I mean, if you get superior services by having double services or different routes, why wait? You're making the argument that the reason they can overlap is that that serves a purpose. Yes, it does. Because why wait? You've got to see what is going to remain in existence. Is CUMTD's routes going to remain in place? Whether they do or they don't could then impact your decision and how much money you're going to spend on trying to devise your routes. But this goes to the second point. Even if it is determined that there's an absolute bar under Illinois law, that's common law that has long been talked about by the Illinois Supreme Court. That has been done by the particular statutory provisions of this act. Because section 3.1 of the local mass transit district act says that in the formation of a district by referendum, that the participating area, that's the area to be defined in the referendum and voted upon, can be formed under the act without regard to boundaries of counties or other political subdivisions or municipal corporations. And by the way, a local mass transit district is defined as a municipal corporation in section 3 of the act. So right there, the General Assembly has deemed it available to a population to vote into existence a mass transit district under their of another local mass transit district act or district. So having that power, then that gets us to the question of the annexation. And there is the problem with section 8.5 that allows an annexation by an existing district, mass transit district, to annex developed territory that's contiguous to it. It says is not, one of the disqualifiers is, is not a part of another local mass transit district. The territory sought to be annexed is not part of another local mass transit district. You read that section, the section 3.1, which says by referendum you can create a district without regard to other mass transit districts and that would suggest that the General Assembly has resolved this issue that council has talked about the problem of two overlapping districts, two taxing districts. If the voters go out and want to create their own district, they do so. They can do so if there is an existing district on top of them and if that existing district on top of them had been annexed previously, then that annexation is going to be void and the voters have put it to it to do that. That's the power the General Assembly has given in this statute and I would point out that there's no other provision in the act for annexations except dealing with requests by other municipalities, other townships, asking an existing transit district to be annexed. So they can... Do you acknowledge that the annexation was valid up until the time that the referendum passed? That's a good question because... Hey, you both said I asked good questions. Never happened before. Never happened before. That might be in jeopardy because it was on August 1 of 05 when the petition for requesting annexation was filed with the circuit clerk under section 3.1 and the court then set a hearing date, which it's supposed to do, to vote on the approval of submitting and that was done on August 29. And so an argument could be made there that at that point, and the annexation by the way, then the ordinance was passed on August 31, two days after the court ruled yes, this can go to a referendum. Okay. I appreciate that, but bear with me here. Let's forget about that particular side issue, we'll call it, and assume that the annexation was done correctly, occurred prior to the referendum. You're suggesting that under the authority of 3.1, the referendum undoes the annexation? Undoes the annexation? That is not a good question. Yes, it does. It nullifies it. Nullifies it. Just nullifies it? Yes, it does. Is there language that says that? Well, you have to read the two sections together. One, the first one, 3.1, says it can be participating area created without regard to existing municipal corporations, i.e. mass transit district. And two, you look at 8.5, there's three things you've got to have to annex. It's got to be contiguous, it's not be taxed as farmland, and is not part of another local mass transit district. And it doesn't say when it should not be another part of the local mass transit district. It does not say at the time of annexation. It does not say any language that says if another district is formed after the annexation, the annexation will remain in force. In fact, it doesn't have any of that limiting language. It says flat out, is not part of another local mass transit district. And you read that together with 8.1, it says a district by referendum can be formed without regard to the boundaries of other districts. That would strongly suggest that it does then become nullified. The other point of our argument is that, of course, the 8.5 statute, section 8.5, is invalid as a special legislation by virtue of the fact that it has given enormous power to a local government that is to forcibly annex continuous property without there having been a request or permission granted by the adjacent governmental entity or property owners therein under that governmental entity. And that this power is only granted to mass transit districts, local mass transit districts. It's a power that not even the Regional Transportation Authority, the RTA, or the Metropolitan Transit Authority, the MTA, which are two massive transit authorities in northern Illinois, not even they have that power. The only way that they can use or operate into adjacent governmental entities is to do so with the permission of those governmental entities. And the question is, what is the rational basis for allowing this special privilege? The answer would be none. If a city, if a city which provides the most benefits to a citizen, protecting them from fire, police, sanitary sewage, utilities, if that cannot forcibly annex, the only time a city can, very limited circumstances where you entirely surrounded an area less than 60 acres or it's a forest preserve that's adjacent to you. Other than that, a city cannot forcibly annex continuous property. A city can't do it. Why should a mass transit district do it? Is bus service more vital than the providing of police and fire? Is it more vital than a drainage district, which cannot forcibly annex? Is it more important than sanitary sewage, which is a district that cannot forcibly annex? And because of that, then it sounds like the mass transit districts have been given a power that in fact no other unit of local government, let alone the other two major types of transportation units, the MTA and the RTA, that they do not have. And so for that reason, that is a special privilege being afforded to the CUMTD that's been utilized by the CUMTD to the detriment of the adjacent governmental entity. In this case, it's the CSWMTD. It's in the class of adjacent governmental entities. In whatever scenario you have where a drainage district wants to annex territory that's maybe in another part of, it's a special privilege then given to the local mass transit districts under 8.5, which should therefore be annulled as unconstitutional. And so for those two principal reasons, your honors, we would suggest that the annexation of the CUMTD of the territory in question should be ruled void and that the CSWMTD should be allowed to continue to exist as it was voted on in the referendum. Thank you. Mr. Ansell? Thank you. First of all, counsel have agreed that we are going to leave this with you as we have extra copies of our own if you would like it. Let me respond to, unless you don't want to take it, we can leave it with you. I think I've seen it sufficiently. Okay. Very good. Then let me respond to the arguments in my rebuttal. First of all, the nullification argument. You've now heard that nullification argument saying that when they form a district by vote, it will nullify that portion that they had formed if it was already a part of another mass transit district. Recognize the logical conclusion here. Neighborhood by neighborhood, block by block, segments could decide to start withdrawing from the existing mass transit district by filing a petition, organizing, and voting. The block I live on, if we put together a petition and we vote a majority of us on the block to start our own mass transit district, we would be out of the Champaign-Urbana mass transit district. This can't be the intent of the legislature. Is his reading correct of the statutes? Absolutely not, and I will tell you why. The language that he's referring to in 3.1, where it says that a new mass transit district can be organized without regard to the boundaries of counties or other political subdivisions or municipal corporations, the word other is referring to other than mass transit districts. That's the only way you can read that word other to be consistent with the 150 years of Illinois law that they can't share territory. They mean without regard to whether you're overlapping a city, go beyond a city, you're part of a county, not a city, you're in a township. That's what other means. It's other political subdivisions other than mass transit districts. Did you do any legislative history to support that, or has this been in existence long before we had legislative histories? This is in existence long before we had legislative histories. We did research the legislative history, but we can only assume that when the Mass Transit Act was passed and these provisions were included in it at that time, that they were in recognition of and consistent with Illinois law, and this is Illinois law that was in effect long before this statutory scheme. So you have to understand the nullification argument means that we could have neighborhoods withdrawing from mass transit if they don't feel they want to use it or pay for it. This can't be the intent of the legislature. You know, council has said that... Yeah, but wouldn't he argue that they're withdrawing from one mass transit but going into another? Well, he would argue that, but what would it do to mass transit in the state of Illinois if we could not have a unified system in a unified urban area? What would these people in this neighborhood do? Pay for a van to drive them around their block, but if they wanted to go somewhere else they'd have to get off the van, walk across the street, buy a ticket, and get on another bus. It's true they would have their own mass transit, but it defeats the purpose of mass transit. Again, I would simply point to you the cases that we pointed out where there's not one in Illinois where an identical government entity is allowed to share and tax with an identical government entity under the same act. The Darnell case, the cases cited as Bartloff and Woodward, they do not involve identical government entities. I noticed the cases use the term coterminous. I looked in blacks. Yeah. So what exactly does it mean? I mean, I read the definition. I'm sure not... I'm not sure what it means in the context that I've seen it and you and I have seen it now together. My understanding of the word coterminous has always been that the borders are identical in all respects all the way around. That is an issue that we're confronting here. Our annexation should not be blocked. The public interest in mass transit, which is the governmental public interest of the highest order in our Constitution of Illinois, should not be frustrated by a group of neighbors who would rather not have to pay for buses because they have cars, who would rather go into the city, take advantage, add to the congestion, use our parking spaces, but don't want to have to pay for the common interests of the urban area that are at stake. Thank you. Thank you, counsel. We'll take this matter...